No. 34.—James Cox, propounder, &c. plaintiff in error, *vs.*
JOSEPH RUTLEDGE and others, defendants in error.

[1.] A will is propounded for probate, discriminating largely in favor of tes-
tator's wife, and against his children by a former wife; amongst other
grounds of caveat, undue influence by the wife is alleged. A witness testi-
fied, at the instance of the caveators, that "bad feeling" had existed be-
tween the step-mother and one of the step-children, who was a caveator;
the witness was proceeding to explain the origin and extent of the enmity,
when he was arrested by the Court, by the request of Counsel for the cavea-
tors: *Held*, that the explanation should have been admitted, and that for
withholding this testimony, a new trial must be granted under the Act of
1853–'4.

Appeal from Ordinary, in Harris Superior Court. Tried
before Judge PERKINS, March Term, 1855.

This was an appeal from the judgment of the Ordinary, ad-
mitting to probate, the will of James Rutledge. All the
questions made are included in the motion for a new trial.

The following are the grounds taken:

1st. That the Court erred in this: that having, on motion
of Counsel for caveators, permitted the witness, Thomas Gran-
berry, to state that Mrs. Rutledge said she had unkind feel-
ings on her part, towards a portion of the Rutledges, the
caveators; the Court then refused to permit the witness, on
motion of Counsel for propounders, to state the reasons which
explained the existence of such bad feelings, given in the
same statement.

2d. That the Court erred in rejecting all evidence of the
existence of unhappy conjugal relations between the deceased,
James Rutledge, and his former wife, the mother of the cavea-
tors.

3d. That the Court erred, when having, on motion of pro-
pounder's Counsel, given the Jury the following charge, viz:
"Fraud is not to be presumed by the Jury, but to be proved
to their satisfaction, before they can find against the will on
that ground." The Court immediately followed up this

Cox, propounder, &c. *vs.* Rutledge *et al.*

charge with the following expression, viz: "I give you this charge, and also charge that fraud may be proved, by the proof of circumstances which indicate fraud, the existence of which is inconsistent, without the existence of fraud."

4th. That the Court erred, when, having on motion of propounder's Counsel, given the Jury the following charge, viz: "Undue influence is not to be presumed, but must be satisfactorily shown, before the Jury can find against the will on that ground; and that argument, persuasion or fair and flattering speeches to the testator, to induce him to make the will, are not unlawful and constitute, in themselves, no valid objection to the will." The Court immediately followed up this charge with the repetition of the following expression, which had been before given in charge to the Jury, viz: "But you must consider the condition of the testator's mind, and determine whether such arguments, persuasions or flattering speeches, were used in such a way as to amount to moral coercion."

5th. That the Court erred in charging the Jury the following supposed state of facts, viz: "For instance, the persevering importunities of a wife who will take no denial, pressed upon an old, feeble, sick man, on his death bed, with his mind impaired, and body racked with pain, and he, in order to buy his peace, makes his will in her favor, such will would be void for undue influence."

6th. That the Court erred in charging the Jury, that if they believe, from the evidence, that the legatees had received their distributive shares after said will had been proved and admitted to record in common form, then they could not contest the same, until they returned the legacies; but if the will had never been proved and admitted to record in common form, they are not bound so to do before contesting it; remarking also, that there was no evidence before the Jury that said will had been proved in common form.

7th. That said verdict is contrary to law and contrary to evidence.

The motion was over-ruled by the Court; to which decision, Counsel for caveators excepted.

Cox, propounder, &c. *vs.* Rutledge *et al.*

The following was the will:

STATE OF GEORGIA, HARRIS COUNTY:

In the name of God, Amen: I, James Rutledge, of said State and County, being sick, and knowing that it is appointed for man to die, and feeling that my dissolution is near, and being of sound mind and disposing memory, do make and ordain this, my last will and testament, in the following manner, to wit: First, I commend my soul, my immortal part, to God, the author of all good, and recommend my body to be interred according to the custom of family burials. Amen.

*Item 1st.*—It is my will and desire, that my just debts be paid by my executors, hereinafter named, as early as possible.

*Item 2d.*—I give and bequeath unto my beloved wife, Emilina Rutledge, two lots of land, one whereon my residence now stands, number not known, and the lot lying due south of it, extending down to Shoal Academy or near thereto, number not known, both lots, together, containing four hundred acres, more or less. Also, one of two wagons, allowing her to make her own selection; one ox-cart, the pleasure carriage and carriage horses, two choice mules, buggy and harness, three sows and pigs, three cows and calves, one yoke of oxen, all my household furniture, (except two beds and furniture,) my kitchen furniture and as many farming tools as she wishes, and the gold watch and chain that she usually wears, and the following named negro slaves, to wit: Sarah and her five children, Jasper, Columbus, Washington, Georgia Ann, Sarah Frances and Daniel, John and Andrew, and also, yellow girl Anna; also corn, meat and fodder sufficient for herself and family for one year's support. I will and bequeath the above specified property to my wife Emilina, absolute, to hold, use, enjoy or dispose of, as she may desire, forever. I also desire, that my wife shall have the gin, fan and running gear to the gin house.

*Item 3d.*—I will and bequeath to my grand-son and daughter, William and Eugenia Caroline, children of my son, John

Cox, propounder, &c. *vs.* Rutledge *et al.*

Rutledge, two bedsteads, beds, bedding and also five hundred. dollars in money.

*Item 4th.*—I will and desire, that my entire estate, both. real and personal, not disposed of by legacy, be sold at public sale, and the proceeds applied as hereinafter directed—said sale to be for a credit of twelve months.

*Item 5th.*—I give and bequeath to my daughter, Ann Lee, one thousand dollars, to be invested in property for her use during her life, and at her death, to the use of the lawful heirs of her body, under the direction of my executor, hereinafter named.

*Item 6th.*—I will and desire, that the residue of the proceeds of the sale of my property, after settling and paying my bequests above specified, be equally divided between my sons, John Rutledge, James Rutledge, and my daughter Ann Lee, and my son Joseph Rutledge, such of them as are in life, and to the lawful children of such as are dead.

*Item 7th.*—I desire and appoint James Cox trustee for my daughter, Ann Lee, and desire that he take all the interest in legacies, bequests, &c. given her, into his control and management, and manage for her interest during her life; and at her death, continue his trust, for the use and benefit of her children, until they shall arrive at the lawful age of twenty-one years.

And lastly, I appoint James Cox my executor, to execute and carry out this, my last will and testament, hereby revoking all wills, either verbal or written, heretofore made.

In testimony whereof, I do hereby acknowledge this, my last will, given under my hand and seal.   In presence of

JOSEPH A. COLLIER,      JAMES RUTLEDGE, [L. S.]
JAMES M. LOWE,
NATHAN PASSMORE,
THOS. P. PARK,

    This 5th February, 1853.

VOL. XVIII—38

JOSEPH A. COLLIER: Knew James Rutledge, deceased, from the time he moved into Harris County; had seen him often; was intimate with him; was frequently at his house. Measles, overseer of testator, came for him to go to testator's house, about his last will and testament; he went immediately after receiving the message—found one or two gentlemen there when he arrived; Passmore and Lowe were there. James Rutledge informed him, when he came into the room, that he had sent for him to witness his will. Mrs. Rutledge was not in the room at the time. The will was dictated, from beginning to end, by James Rutledge; and after it was finished, Dr. Park read it over distinctly to him. Rutledge said it was "all right," and signed it in the presence of the subscribing witnesses. He seemed as much in his mind as witness ever knew him. Witness saw no evidence of mental weakness on the part of testator—attested the will in the presence of testator and the other subscribing witnesses; they also signed it in his, testator's, and each other's presence. The will was written by Passmore and Dr. Park. Mrs. Rutledge is a lady of high, moral character—was a kind and attentive wife. After the will was finished and read over by Dr. Park, deceased made a correction, then requested prayer. Witness came at the request of Measles, overseer of testator, about the will; deceased wished to make a bequest to two little grand-children, and remarked, either that he had forgotten or that he did not know the given name of one of them—a little girl; requested witness to go and ask Mrs. Rutledge; witness did so; Mrs. Rutledge told him that she did not remember the name—to go and ask Sarah; Sarah told witness the name; Sarah is an old family slave; witness having learned the name, went back to deceased and told him the name, and deceased again went on with his dictation; Mrs. Rutledge came into the room once during the writing of the will—remained but a very short time—whispered something to deceased and went out of the room; after she went out, deceased again went on with the dictation, where he had left off when Mrs. Rutledge came. The instrument propounded

in this case was shown to witness, and he identified it as the will which he saw executed, and which he attested.

Witness testified that he lived about a mile and a quarter from testator, Lowe three miles, Passmore three miles, Park one and a half, and William Rutledge about the same distance as witness; Mrs. Emilina Rutledge had four children by Granberry—the youngest about 17 years old; two were living with her when the will was made, and two now—one returned from California; on being asked if he had not taken an active interest in the support of the will, witness said he felt an interest in any lady in Mrs. Rutledge's condition; brought her to Court to-day in her buggy; witness furnished the horse and she the buggy; has heretofore come in her carriage; he is a little lame, and it hurts him to ride horse-back much.

Dr. THOMAS PARK: Knew James Rutledge in his life-time; had known him only about 12 or 18 months; was not very intimate with him; was a physician, and practised a little in testator's family; on the day before the will was written, witness went there to see a sick negro; the old man was complaining, and he prescribed for him; he told witness he was going to make his will, and he wanted him to write it; witness smiled and told him he might live many days yet, but that he would write his will any day he would send for him. On the morning of the execution of the will, he went over, being sent for, and found the other witnesses there, and Passmore, writing the will; had written the caption; witness finished it; Mr. Collier sat by the bed-side, and the testator dictated to Collier, and Collier to witness. After writing the will, he read it over to testator, when he said, "that'll do," or "all right," or something to that effect. Testator signed it in the presence of the witnesses, and they attested it in the presence of the testator. Witness thought the testator was in his mind. After the will was written, or before it was finished, some one suggested that a negro woman, named Ann, was left out; does not remember who made the suggestion; she was then added. During the writing of the will Mrs.

Rutledge came into the room, conversed a little with deceased, and left again.. After writing the will, witness gave it to Mrs. Rutledge; never knew testator before he moved to Harris County; he was confined to his bed, unable to sit up, when the will was made; all the while witness knew him he was quite infirm and feeble; rode about in his carriage, and walked with a staff; his mind was quite weak; was getting in his dotage; his mind kept pace with his body, in its approach to the grave. If he was a man of strong mind in Troup, his mind had greatly depreciated; but as witness did not know him then, he could not institute the comparison; witness regarded him as a man of ordinary capacity. While writing the will, testator failed to answer questions, and they examined him and found him asleep; they had to wait several times, and allow him to rest; that the disease was not at a stage where he considered James Rutledge dangerous; it had not affected his mind; the disease was pneumonia; it does not ordinarily affect the mind, except in the last stages; witness visited testator every day or two; he lived from Saturday to Saturday, eight days from the writing of the will; had been sick a day or two before the writing of the will; considered him in his mind until a day or two before he died; had taken some alterative medicine, but nothing to induce sleep; testator said, when his will was being written, that it was hardly necessary to make promise to pay his debts,. as he only owed three dollars, which was to Dr. Yarborough.

NATHAN PASSMORE: Aided in writing the will propounded; that Dr. Park wrote the rest of it; that testator, Rutledge, dictated it; that when it was completed it was read over to testator; that testator said it was all right, and signed it in the presence of the witnesses, Collier, Park, Lowe and himself, and that the witness, subscribed to it as such, in the same room with the testator, and were, or might have been seen by him. Witness thought, while the will was being written, that testator was capable of making the will; but reflecting afterwards, that testator had forgotten the name of one or both of the grand-children named as legatees, and was obliged to have

them stated to him, in order to have them named as legatees, and being, subsequently to the execution of the will, informed that the children had been a good deal with him and were favorites of him, he was led to doubt, and still doubts, whether testator was able to make his will. Testator was from 60 to 65 years old, and very sick and confined to his bed all the time; witness doubts whether any one so sick as he was, could make a will; he rested frequently while the will was being written. While the will was being written, the name of Anna was first omitted, and on the reading over the will before its execution, testator directed the name of Anna inserted, saying that his wife would value her more highly than any other property given her. While the will was being written, dinner was eaten; Mrs. Rutledge did not dine with the company; witness thinks that it was after dinner that the name of Anna was inserted in the will, but about this cannot be positive; it was at the suggestion and request of the testator. Mrs. Rutledge was kind and affectionate to testator, and made him a good wife so far as witness ever knew or heard; testator was kind and affectionate. Witness thinks it was just as they came out of the dining room that the name of Anna was inserted. Witness was not prepared to say that the testator was of sound, disposing mind and memory.

JAMES M. LOWE: Called in the morning at the house of testator, and found him very sick; testator said to witness that he was very sick, and did not inquire after witness' family, which was very unusual with him. He attempted to vomit, and his wife held a vessel to receive it; she invited the company to leave the room; they did so, and remained out about a half or three quarters of an hour. The door was then opened, and Mrs. Rutledge invited the company to return, and a table, with pen, ink and paper, was found by the bed-side when the door was opened; witness was not in the room with testator while the will was being written, but came in when it was completed, to witness it, and did so. Testator was old, stupid and very sick; and witness thinks, he was not capable of making a will at the time; he lay on his bed,

propped up to sign it. After the will was signed, testator said it was all right, and requested prayers to be made. As witness was leaving, he said to testator, "Farewell," and held out his hand to testator; testator shook hands with witness at parting. Witness was then, and is yet, of opinion, that testator was not of sound, disposing mind and memory. Mrs. Rutledge was a kind and affectionate wife, and of good character, so far as witness knows.

WILLIAM RUTLEDGE: Testator was brother and close neighbor of him; lived in Troup County at the time of marriage; had a good house and plantation there, and was well fixed; the marriage took place in 1849 or 1851; they moved to Harris County to the place where testator died. Witness received no message to come to testator's house when the will was made, and never heard testator speak of making a will at any time after the marriage. Witness recommended testator to make a will when the late marriage was had, believing that testator had given her property, as testator had told him so; and testator told him he was satisfied to let the law make his will. Testator's first wife was a very laborious, industrious and acquisitive woman; was a mid-wife, and rode night and day in her vocation as such. The present Mrs. Rutledge was a near neighbor at the time of her marriage with testator, and was a very affectionate, industrious and neat woman. Witness recommended testator to marry her, and so far as witness knows, she made testator a good wife. She and testator always lived in peace and harmony, so far as witness knows. Testator advanced his children, and assisted them from time to time, many years ago; they were three in number—from 30 to 40 years old, and established in life; worth, two of them, $8.000 or $10.000 apiece, and one of them $3.000 or $4.000, at testator's death. Witness thinks he heard testator speak, once or twice, after his second marriage, of his sons not having treated the negroes he had given them well, and of his being indisposed to give them any more; but of that, witness is not positive. Testator was kind and affectionate. Witness was asked if the legatees had re-

ceived their legacies under the will; he replied, that he did not know. He was then asked where were testator's negroes? He replied, they were in possession of the legatees, he supposed. The Counsel for propounder asked witness if the caveators had not received their distributive shares under the will? Counsel for caveators objected to it; that evidence on that subject was in writing; that there was a written agreement which should be produced. Propounder's Counsel then said to caveator's Counsel, " Well, produce it then." Caveators' Counsel replied, "It is in your own possession—produce it yourself." The propounder then himself remarked, that " he had it, but had left it at home," and the question was then dropped; Counsel for caveators saying he would admit the distribution according to that agreement, and according to that only.

DR. BAUGH: Testator had a good house and plantation in Troup County; was very fond of his grand-children, one a boy, named William, about 15 years old, and the other a girl named Eugenia, now about seven years old; she is, and has been usually called " Sis." Testator was kind and affectionate to his children, and they were obedient to him; he was kind and affectionate in his nature. The father of the grandchildren lived within two miles of testator, in Troup, and the grand-children were with him a good deal while in Troup. The children of testator were grown up and of moderate fortunes. Witness married the widow of John Rutledge, and boarded in the Rutledge family before his marriage.

A. MEADOWS: Lived with testator the year before he made his will. That one morning at breakfast, testator fell asleep at the table, or fell into a state resembling sleep, as though he had lost his mind. His wife looked at him, and asked him what was the matter, saying he looked like a fool. Testator replied he felt like one. Mrs. Rutledge's manner was not insulting or angry; they lived in harmony and peace.

JAMES M. LOWE, re-introduced for caveators, testified that a short time before testator's death, he bought a horse for about $40, and gave his note and witness as his security, and

witness knows this debt was not paid until after his death.. The account of three dollars, to Dr. Yarborough, was called' for by the testator the day after the will was written, and paid, and testator said he owed no other debt.

The interrogatories of MARY RUTLEDGE:

She did hear a conversation that Mrs. Emilina Rutledge had with her husband, James Rutledge—a conversation about making his will.  The conversation was held at the house of James Rutledge, when he resided in Troup County, and to the best of her recollection, was sometime in the year eighteen hundred and forty-nine.  In that conversation, Mrs. Emilina Rutledge told her husband he ought to make his will and give to Mrs. Lee more of his property than to any other of his children, as she had a hard time in this world; that her husband did not treat her well, and he ought to place it in good hands, so that she might enjoy it, and so that it would do her some good.  To the 3d interrogatory, she answers : That she has heard Mrs. Emilina Rutledge frequently speak of the making of her husband's will, saying that he ought to make his will, as he had sick spells very often, and that he might drop off without having his will fixed as it ought to be.  To the 4th interrogatory: That she has heard Mrs. Emilina Rutledge say, that all she married James Rutledge for, was to get his property; that it was a disgrace to her to marry into the family, and that she would not have married him if it had not been for his property; that her neighbors, some of them, were very sorry for her for marrying him; deponent knows nothing further that will benefit the caveators.  She does not know that James Rutledge made a will; never saw any will of his; does not know which will the conversation was about; cannot swear that he ever made one.  Witness is a daughter of Joseph Rutledge, and Saunders W. Lee married witness' aunt; James Rutledge, deceased, was witness' grandfather. Witness does not know what Lee and the Rutledges are worth; they own land and negroes, and as far as witness knows, are in tolerable condition in life.  Witness says that her memory is tolerably good, and that her brother, John.

Rutledge, and a daughter of Mrs. Emilina Rutledge, was present at the conversation referred to ; her daughter was named Martha Granberry ; does not know anything about the Rut-- ledge boys treating Mrs. Rutledge badly ; did not hear her say anything about it in the conversation referred to ; did hear her say on one occasion, in speaking of uncle James Rutledge, that *he* had treated her badly, but that she had forgiven him. Witness has stated all of the conversation that she recollects, in her answers to the direct interrogatories, which she desires may be taken as her answers to this part of the cross-interrogatories.

The depositions of MARTHA BAUGH:

I have heard her speak of a determination to have a will made before his death ; and heard her speak of the will after his death. Mrs. Rutledge said, before his death, she intended to have a will made, and never intended to let him rest until he did make one to her own notion, and she intended to have all that was willed to her, to do as she pleased with, or she would not have anything at all. I have heard her make these remarks, in substance, repeatedly, while in her company. The day after his burial, I heard her, while in conversation with Joseph Rutledge, ask him what would be done with the property ? Joseph Rutledge replied, that he did not know what the will was. She replied, that as to her part, she knew very well what was willed to her. Joseph Rutledge said he did not know what to do, until he saw Mr. Lee. She replied, that Mr. Lee had nothing to do with it, and did not have the wrappings of her finger. She then turned to William Rutledge, son of John Rutledge, and said she knew what was willed to John Rutledge's children. She also said she could have influenced the old man to give her anything she wanted, and his children might be glad that they got as much as they did. I have heard her say that she had an influence over him, and that she could influence him to make just such a will as she wanted. Her object was to have her part willed to her bona fidely. I know nothing more that would benefit

the caveators.    I am related by marriage; I was the wife of
John Rutledge, brother to Joseph and James Rutledge; the
caveators did not talk to me about the will; the conversations
before his death, were at my house and at her house before
she moved to Harris; that since his death, was, on the morn-
ing after his burial, at her own house; she universally com-
menced the conversation herself; I never made any reply;
the conversation after his death, 'was with Joseph Rutledge
the morning after his burial; I never made any remarks; the
conversation was not directed to me.    I have stated in my 2d
direct interrogatory what led to that conversation; I was not,
and had no idea that the will would be caveated; I did not,
at any time, converse with Mrs. Rutledge about the will; she
frequently talked about it in my presence, and I suppose it
must have lain heavily upon her mind, and that she wanted
more than the law would allow her, and willed so that she
could do what she pleased with it.    I never was requested to
pick up any information respecting the case; he frequently
complained of ill health; I do not think his mind was as good
the last time I saw him, as it was when I first became ac-
quainted with him; he was a man of industrious habits and
had accumulated a fair fortune; I live some distance, and do
not know much about Mr. Lee's circumstances, but I suppose
he (with the other caveators) is in moderate circumstances.

MARY MILLNER'S depositions:    I heard Mrs. Rutledge say
at Dr. C. C. Gibb's hotel, in Hamilton, I suppose in May or
June, that the children ought to feel themselves under obli-
gations to her for what property was willed them; and Mr.
Rutledge, after he had made his will, asked her if she thought
she had land sufficient, to which Mrs. Rutledge said, she
had.

I paid particular attention to what Mrs. Rutledge said: I
never heard Mrs. Rutledge say that the children of Mr.
Rutledge had mistreated him.

The depositions of Mrs. ELIZA CREWS:    On about the 8th
day of February last, I was at the house of the deceased, and
Mrs. Rutledge told me that Mr. Rutledge had made a will,

but she was not in the room, and did not hear it read; but she supposed Mr. Rutledge had given her something. At a different time, Mrs. Rutledge said she influenced Mr. Rutledge to give her a smaller portion of land than he wished to give her.

We are near neighbors and friends, but I do not know that she communicates to me more freely than to others.

The depositions of Mrs. HANNAH LEE: Myself and Mrs. Rutledge did have a conversation previous to the death of James Rutledge, deceased; stated that she did not intend to let him (her husband) rest until he made a will; that he (her husband) had not given her anything yet; that Mrs. Rutledge, above referred to, asked me if I thought that Mr. Rutledge was not easily influenced. I know nothing more that will benefit caveators to said will. The answers to the cross-interrogatories: I am the mother of Saunders W. Lee, one of the legatees in said will, as I suppose. I think it was in the Fall season of 1850; it was about two years previous to his (Rutledge's) death, or, perhaps, a little over. She did not say anything to me in regard to her desire, to have Lee's wife provided for, that I now recollect. I do not know what he is worth, but suppose he is worth some $30 or $40.000. I do not know what Joseph and James Rutledge are worth; I know nothing more that will benefit the plaintiffs.

The depositions of PAMELA BUTLER: During the life of James Rutledge, deceased, she heard a conversation between him and his wife, Emilina Rutledge, about the making of his will; heard Emilina Rutledge, repeatedly, ask her husband, James Rutledge, to make his will, and say that she intended. making him do so; that he should never rest until he did make his will; he, James Rutledge, replied, frequently, that he never intended to make a will, that the law was sufficient for him. The above conversation took place in February or March, of the year 1851, in the town of Newnan, Coweta County, Georgia. The style, manner and conduct of Emilina Rutledge, was sometimes pleasing and persuasive, and sometimes commanding and coercive; that of James Rutledge,

calm and kind. Don't remember hearing Emilina say, "well, old man, I'm on the will again." 4th. She knows nothing more that will benefit the caveators, in relation to undue influence being exercised over the mind of said James Rutledge, only other conversations of the same nature of the one already stated in the answer to the 2d, direct interrogatory. Knows that the mind of James Rutledge was weak at the last time he was seen by witness, which was in July, 1852. She knows nothing about James Rutledge's children trying to get him to make a will to disinherit his wife; don't know that his brother and children ever attempted such a thing. I am the grand-daughter of James Rutledge, the daughter of Saunders W. Lee and his wife Ann, who is the daughter of James Rutledge. Don't remember who was present at the conversation stated in the second, direct interrogatory.

The interrogatories of ULYSSES B. FROST: He has had some business transactions with James Rutledge in his lifetime. Some few weeks before the death of the said James Rutledge, I bought a load of cotton of him, in Columbus, and paid him for it; and after having completed the trade, it was proposed, either by him or me, and I don't remember which, that I should buy from him another lot of cotton which he had at home, consisting of some 9 or 10 bags, more or less, and that I should buy it blind, as it is sometimes termed; and after talking over the matter a few moments, as to the price, &c. I made a trade with him for said cotton, and at a price that I do not, now, recollect exactly; and, as I suppose, at the time, a trifle under the usual price of such cotton as it was represented to be. I had taken out my ticket-book and given him a ticket for the cotton, according to the usual custom; and then Mr. Rutledge remarked, that he was too hasty, that I must let him speak to his wife before the trade was confirmed, his wife being at that time near us, in a carriage; and after talking with her a few moments, she confirmed the trade, or rather consented to it; and I took the cotton, which was in a few weeks delivered to me, as agreed upon. I don't know that I can say anything very particular as to the condition of

his mind, at that time; I can only say that I did not consider him as quick and shrewd, and as vigilant, in a business transaction, as I had seen him formerly. In two or three instances, about that time, in paying him money, he would take it from the counter, and put it in his pocket without counting it, which circumstance I noticed at the time, and remarked upon it to some one. He cannot say that said Rutledge was not competent to transact ordinary business for some months before his death, but can only say, that the condition of said Rutledge was such, that a better trade could be effected with him, at that time, than with ordinary men; and, I should say, in a trade, advantage could have been more easily taken of him at that time, than at any earlier period of his life. He has not studied the science of Medical Jurisprudence, and is, therefore, not acquainted with it. He cannot say that James Rutledge was, at any time, insane. From 1837, up to the time of his death, I frequently met with the said Rutledge, and talked with him. I did buy said Rutledge's cotton a short time before his death, as stated above; and I am a cotton-buyer; I made from 3 to 5 dollars a bale on the cotton I purchased from him blind; and I traded with him; I think it was but a few weeks before his death that I saw him.

The interrogatories of ELIZABETH JAMESON: She is not particularly acquainted with the pecuniary condition of Mr. Lee and the Rutledges, and she cannot, therefore, state what they are worth; has understood, however, that Mr. Lee is a man of considerable property. She was present at the house of James Rutledge, some nine or ten days before his death, and the day before he made his will; and heard a conversation between Mr. Rutledge and his wife, in relation to the making of his will; was in an adjoining room to Mr. Rutledge and his wife when she heard the conversation. Mr. Rutledge told his wife he was going to make his will, and how he intended to make it. He told his wife he was going to give her five hundred acres of land, all the household and kitchen furniture, carriage and horses, buggy and two choice mules, a wagon, a choice yoke of oxen, cart, two choice milch cows and

calves, two choice sows and pigs, and the plantation tools, and his negroes: Daniel, Sarah, Jasper, Columbus, Washington, Georgia Ann, Sarah Frances, John, Andrew, and Anna He also said he was going to give her the watch she wore. He asked his wife if she would be satisfied with the property he intended giving her, and his wife replied that she was perfectly satisfied, and that she wanted him to make *his* will and not *hers.* It was some nine or ten days before the death of Mr. Rutledge, when the above conversation was had. Mrs. Rutledge, the widow of James Rutledge, is her mother.

The interrogatories of MOSES JONES:

He sold James Rutledge the plantation on which he last lived in Harris County, and on which the said James Rutledge lived the last time he saw him, containing nine hundred and ninety-six acres; he said nothing of securing his wife a home, at the time of the purchase. In July, 1851, he asked me to show him the lines of the land I sold him, and also give him the numbers of the land; and he stated to me, at that time, that he was going to make his will, and secure the settlement of the plantation on his wife for a home. It was not convenient for me to grant his request, though often requested so to do, until about the first of January last, at which time I showed him the lines of the land, and gave him the numbers of the lots and parts of lots. He asked me where would an open line run, so as to secure the orchard on the place with the house—giving his wife five hundred acres or thereabouts—so as not to injure the other part of the plantation; and I showed him where I supposed the line would run, and he stated that he was going to execute his will that way, at the first convenient opportunity.

THOMAS GRANBERRY: Lived for some months with testator and his mother, Mrs. Rutledge, while they were in Troup; that testator's children did not often visit testator while witness lived with testator and family; that testator's children by his first wife were grown up and established; that testator seemed to love his grand-children, and some of them boarded with him.

GEORGE GRANBERRY : The time the will was made, he dispatched a messenger, a negro, for William Rutledge, a brother of testator, who did not come; that witness is a son of Mrs. Rutledge, by a former husband; lived in the house of testator, and mother of witness; was well acquainted with testator; that testator, during his last illness, until a day or two before he died, retained his mind, conversed intelligently and gave directions about his affairs as usual. Witness thinks testator's mind was clear and strong enough to make his will, at the time it was executed.

Cross-examined : Witness testifies, that he lived in the family while they were in Troup ; that Mr. Rutledge had occupied, then, a good two story framed dwelling, comfortable and pleasant; had a nice lot and some land about it; lived in the village of LaGrange. Witness heard Mrs. Rutledge, mother of witness, say, that bad feelings existed between her and one of the caveators. Here witness was about stating the explanation of that bad feeling, which explanation was connected in the same sentence with the admission of the existence of bad feeling by Mrs. Rutledge, when Counsel for caveators objected to receiving that part of Mrs. Rutledge's statement to witness, which contained the explanation of the bad feelings referred to. Counsel for propounder insisted on proving the whole of Mrs. Rutledge's statement, but the Court sustained the objection of caveator's Counsel and rejected that part of the statement of Mrs. Rutledge, which explained the bad feeling which, in the same sentence, she had admitted to exist.

BLOUNT C. TERRELL : Had known testator since 1841 ; he always walked with a staff; was a little lame. While in Troup, testator was regarded as a man of good mind, and kind and affectionate, and lived well with his children by his first wife, the caveators, and the caveators were kind to testator.

STRIBBLING : Knew James Rutledge, testator, from the time testator moved into his neighborhood ; was very frequently at testator's house ; considered testator a man of active mind, because he attended to his own business when he had

no overseer; he directed his overseer, when he had one; died: eight days after the writing of the will; witness was at testator's house several times during the interval between the writing of the will and testator's death; considered testator perfectly " at himself," i. e. his mind as good as ever it was; heard testator question overseer about his farm, a night or two after the writing of the will; testator asked the overseer where the negroes were at work, meaning at what particular portion of the farm they were then engaged; the overseer having informed him, testator expressed his approbation and added some further directions; this was but a very short while before testator's death; considered testator as rational as any old man of his age and his condition; knew testator two years, and he had an overseer all this time. He heard testator request his wife to go with him to Columbus, when the cotton was sold; that she rather objected, and that he insisted, saying to her that he wanted her society.

It was admitted that the estate of the testator was worth forty thousand dollars, and the legacy given by the will to Mrs. Rutledge, worth eleven thousand dollars.

RAMSEY; WELLBORN, for plaintiff in error.

MOBLEY; B. H. HILL, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] Was the Court right in excluding so much of the testimony of Thomas Granberry, as explained the origin, nature and extent of the " bad feeling" exhibited by Mrs. Rutledge, toward one of her step-children, and caveators of the will?

Counsel for the caveators had drawn from the witness the fact, that this hostility was, or at least had been, entertained. He conceived it to be legitimate testimony; and we think it was. Here was a marriage, bringing together two sets of children—those of the husband and those of the wife—by by their former marriages. A will is made, discriminating.

largely in favor of the present wife, and against the children by the first wife. It is alleged to have been produced by the undue influence of the wife over the testator, who was a feeble and infirm old man. Is it not natural, under such circumstances, to inquire into the character of the relations which existed between the last wife and the step-children?

Upon reading the will, and seeing the difference in the testator's bounty, would not the question occur to the mind—are these the children of the testator's wife? And could you not show that they were not, in order to account for the difference in the testamentary bequests to her and to them?

And if so, would you not pass, by an easy step, to the further fact, as to the state of feeling between the parties? I know, from observation, that step-mothers and step-children, as well as mothers-in-law and daughters-in-law, are natural enemies. There are, however, exceptional cases. And to their credit be it spoken, there are some step-mothers who, to the world at least, exhibit the same kindness to their step-children as to their own offspring.

If such were the terms upon which this family lived, might it not have been proven? And if the contrary was true, might it not have been shown?

We are clear, therefore, that Counsel for the caveators asked a proper question, when they interrogated the witness, Granberry, as to the enmity between Mrs. Rutledge and one of the caveators. And we are equally well satisfied, that the Court should have permitted the examination to have been prosecuted further; and that the witness should have been allowed, as he was proceeding to do when stopped by Counsel, to have explained the cause and extent of the difficulty.

Suppose it should have turned out, as we have reason to conjecture it would, from another part of the record, that whatever unkind feeling may have been engendered, it had long since passed away and been forgiven and forgotten, would not the Jury had a right to infer that it had ceased to operate as a motive for causing to be made an unequal will?

It is like the case of a Juror who, by the expression of a crude and unformed opinion, disqualifies himself to sit on the trial; but upon further examination, it is found that the language he used, was the mere ebullition of the moment; and he is pronounced by the Court or triers, a competent Juror.

We further affirm the judgment upon every other assignment but the first, and regret that we are forced, by the imperative terms of the Transcendental and Judicial Perfectability Act of the last Legislature, to remand the cause for a re-hearing, upon this ground.